# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 95-CT-01199-SCT

*DON JERRELL WILLIAMS*

*v.*

*STATE OF MISSISSIPPI*

### ON PETITION FOR WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 09/06/95 |
| TRIAL JUDGE: | HON. L. BRELAND HILBURN, JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: SCOTT STUART |
| DISTRICT ATTORNEY: | EDWARD J. PETERS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 12/10/98 |
| MOTION FOR REHEARING FILED: | 1/6/99 |
| MANDATE ISSUED: | 4/12/99 |

**EN BANC.**

**BANKS, JUSTICE, FOR THE COURT:**

¶1. Williams was convicted of murder in the beating death of Jessie Cutley which occurred in a public street while Cutley was walking home. Williams was indicted along with several other co-defendants. The Court of Appeals affirmed the conviction. We granted certiorari to consider whether the jury was adequately instructed. We conclude that it was not. His Petition for Writ of Certiorari challenges the Court of Appeals' findings on all nine assignments of error. Jury instructions allowing the jury to consider deliberate design murder and manslaughter were granted. The evidence of "deliberate design" (malice aforethought) is weak, and there was no instruction adequately explaining the required elements of deliberation or premeditation, to guide the jury in differentiating between murder and manslaughter. This error combined with trial court's failure to give a cautionary instruction regarding accomplice testimony requires reversal. Accordingly we reverse the judgment and remand this matter to the trial court.

**I.**

¶2. During the early morning of May 27, 1994, Jessie Cutley began to walk from his cousin's house to his house located on Cherry Street in Jackson, Mississippi. As Mr. Cutley walked home, he eventually came into contact with Arnotia Baker, Kevin Smith, and Kevin's sister, Catrina Smith. Arnotia, Kevin's girlfriend, testified that as they walked from a store in the same area, she saw her father drive past on Terry Road. As she turned to the others and stated that her father had passed by, Mr. Cutley stopped in the street and smiled. Arnotia testified that Mr. Cutley must have thought she was speaking to him. At this point, Kevin went over to him and punched him in the head which made him fall down in the street. Don Williams, several other boys, and Kevin's other sister, Carla Smith, then walked up the street to where Mr. Cutley lay. They hit, kicked, and stomped him in the head, side and thighs as he bled in the street.[1] Two of the boys (not Williams) also threw a water gun and a beer bottle at Mr. Cutley's body. Jackson police later found these items at the scene.

¶3. Mr. Cutley died of multiple blunt head trauma. Nine persons were originally arrested for the killing, however only seven indictments were returned including Don Williams, the petitioner, who was tried and found guilty of murder. Carla Smith, Kevin Smith, Jeffrey Myers, and John Earl "June" Thomas pled guilty to manslaughter. Robert Hicks and Terry Edwards' trials were apparently pending at the time of Williams' trial. Catrina Smith, who was 12 years of age at the time of the incident, was prosecuted as a juvenile in youth court. Arnotia Baker, who was present that night, was never indicted.

¶4. Different versions of how the beating began were given by Katrina, Arnotia, and Jeffery Myers, accomplices in the beating. Katrina stated that Mr. Cutley called Arnotia a bitch. Arnotia initially stated in her police report that Mr. Cutley called her this name. However, she later denied that he made this statement, stating further that Kevin lied about the fact that Mr. Cutley called her a bitch. Arnotia testified that Mr. Cutley never called her any names, but merely acted friendly. It was her impression that Kevin merely wanted to start a fight with someone that morning. Jeffery testified that Mr. Cutley was minding his own business. He did not do or say anything to any member of their group to provoke them into a fight. It was uncontradicted that Kevin Smith struck the first blow with his fist knocking Cutley to the ground and was later joined by the others, including Williams, as the kicking began.

¶5. Katrina, Arnotia, and Jeffery also testified specifically that Williams was involved in the beating. Arnotia testified that she saw Williams kick and hit Mr. Cutley in the side during the same time the others were kicking and hitting. According to Jeffery, Williams kicked Mr. Cutley in the area of his legs. Only Katrina, age 12 at the time of the incident, testified that she saw Williams kick Mr. Cutley in the side *and* head.

¶6. Williams, along with Katrina, Carla, Kevin, Jeffrey and several other young men were arrested for murder. Williams' motion to sever his case from the other defendants was granted. A trial was held and Williams was convicted of murder and sentenced to life imprisonment. The Petition for Writ of Certiorari asserts that Williams is the only one of the group who stands convicted of murder.

## ANALYSIS

¶7. On appeal, Williams assigned nine errors. These are set out as follows:

(1) The trial court improperly limited the cross-examination of pathologist Dr. Rodrigo Galvez and the introduction of possible mitigating and exculpating evidence.

(2) The trial court improperly limited the cross-examination of Jeffrey Myers.

(3) The jury was inadequately instructed on manslaughter and murder.

(4) The trial court erred in refusing to instruct the jury about malice aforethought and deliberate design.

(5) The trial court erred in refusing to give a cautionary instruction about accomplice testimony.

(6) The evidence did not adequately support a murder conviction.

(7) The sentence of the appellant was unconstitutionally disproportionate to the co- defendants' sentences.

(8) The jury was improperly instructed on reasonable doubt.

(9) The trial court erred in not giving a simple assault instruction.

We find merit in only two.

## II.

¶8. Williams contends that the Court of Appeals erred in ruling the trial court adequately instructed the jury about malice aforethought and deliberate design and that this conflicts with this Court's ruling in *Peterson v. State,* 242 So.2d 420 (Miss. 1970). In particular, in his direct appeal on this issue he complained of the trial court's denial of his requested instruction D-10 which read as follows:

> The Court instructs the jury that to prove that the defendant acted with malice aforethought, the prosecution must prove beyond a reasonable doubt that the defendant acted with premeditation and deliberation.

> Deliberation requires that an individual under the same circumstances as Don Williams, as shown by the evidence in this case, give consideration to the intent to kill. There is no prescribed length of time for deliberation.

> A killing, even though intentional, committed on impulse in the heat of passion is without deliberation and without malice aforethought.[2]

The Court of Appeals found that:

> Although the term "malice aforethought" was not used in any accepted jury instruction, the term "deliberate design" was used in Instruction S-1. Deliberate design is synonymous to malice aforethought and synonymous phrases or interchangeable words may be used in a jury instruction and the jury still be properly instructed. *Lancaster v. State*, 472 So.2d 363, 367 (Miss. 1985). Though the precise definition of deliberate design was not given, this Court will not reverse for denial of an individual instruction when the jury has been instructed properly and fully by the granting of all the instructions. *Catchings v. State,* 684 So.2d 591, 599 (Miss. 1996). The elements of murder were sufficiently addressed by the granting of other instructions. This assignment of error is without merit.

¶9. While *Peterson* does approve the granting of instructions explaining the absence or presence of malice, the Court of Appeals applied this Court's holding in *Catchings*, which held that the granting of such an instruction was unnecessary where other instructions properly instruct the jury. [3]

¶10. However, in *Catchings,* the Court went on to hold that

> Where deliberate design and manslaughter instructions are given, and "where under the evidence the jury might reasonably have concluded that the defendant acted in the heat of passion, we will ... ordinarily reverse." *Blanks v. State*, 542 So.2d 222, 227 (Miss. 1989)
>
> However, in *Nicolaou v. State,* 534 So.2d 168 (Miss. 1988), this Court held that giving the "deliberate design" instruction and a manslaughter instruction was harmless error where the manslaughter instruction was not warranted under the evidence of the case. *Id*. at 173. Thus, whether the giving of the deliberate design instruction constitutes reversible error depends on whether the giving of the manslaughter instruction was warranted by the evidence in this case. See *Blanks,* 542 So.2d at 227; *Nicolaou,* 534 So.2d at 173.
>
> Manslaughter is "[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense." Miss. Code Ann. § 97-3-35. There is no evidence in the record that Catchings acted in the heat of passion. Catchings' own testimony was that he went outside the Short Stop to talk to Cassidy and that he had no intention of harming Cassidy. Catchings also testified that, once outside, Cassidy waved a knife at him, cursed him, and threatened him.
>
> It appears from the record that the defense raised by Catchings at trial was self-defense. In which case,
>
> there is no reasonable factual scenario under which the jury may reasonably have concluded, [under the deliberate design instruction], that [the appellant's] premeditated design to kill, if any existed in his mind but for an instant before the fatal act. On the prosecution's interpretation of the evidence, the premeditated or deliberate design existed well before the [slaying]. On the defense theory, it never existed. In this context, we declare the granting of [the deliberate design instruction] as harmless error.
>
> *Blanks*, 542 So.2d at 227. Thus, the manslaughter instruction was not warranted in this case. See *Id*. Therefore, the giving of the deliberate design instruction was harmless error.

*Catchings,* 684 So. 2d at 595.

¶11. In other words, in this case, unlike *Catchings* and *Blanks,* the manslaughter instruction was clearly warranted as there is ample evidence from which the jury could infer that Williams acted on impulse or in the heat of the moment, but the jury was given no guidance on the issue of how to determine the presence or absence of premeditation. The primary distinction between the two instructions is the inclusion of the term "deliberate design" in the murder instruction and the words "without malice" in the manslaughter instruction. It was not erroneously instructed as the juries in *Catchings, Blanks,* and *Windham* that the deliberate design could be formed at the instant of the fatal act, rather, this jury simply was not instructed at all as to when malice or design to commit murder may or may not occur. No other instruction in this case addressed the issue.

¶12. The State argues that it is not error to refuse an instruction defining "malice" and "deliberate design", citing *Nicolaou v. State,* 534 So.2d 168, 174 (Miss. 1988). In that case, the trial court granted a supplemental instruction after the jury had retired to deliberate upon written request from the jury. The trial judge in that case attempted to fashion an instruction using *Black's Law Dictionary* to define the concept of

malice. In finding this instruction to be error, this Court cited *Smith v. State,* 237 Miss. 626, 114 So. 2d 676 (1959) wherein the Court stated that it is unnecessary and unwise for the circuit court to attempt to define "malice" in jury instructions. In *Smith,* as in *Nicolaou,* the trial court was asked to instruct the jury as to the concept of "malice" or render a black letter definition of the concept of "malice." This is not the situation here, and such an instruction would be error.

¶13. What is under consideration in this case is whether, in a prosecution for deliberate design murder, where a manslaughter instruction is warranted and granted, the jury should be instructed as to how to determine the "aforethought" portion of "malice aforethought" or the "deliberation" portion of "deliberate design." We hold that such an instruction is proper in such a case as this, and error in this case to refuse a proper instruction (D-10) thereon. *See also Alexander, Mississippi Jury Instructions,* § 3145.

¶14. This issue overlaps with the question of whether the murder conviction is adequately supported by the evidence. The Court of Appeals found that

> In Williams's sixth assignment of error, he contends that taking the State's case in the best light, the evidence only supports a conviction of manslaughter. He suggests that there is no evidence that he formed, nor premeditated, an intent to kill. We disagree. Arnotia's, Katrina's and Jeffery's testimony support his conviction of murder. Each one of these eyewitnesses stated that Williams either kicked, hit, or stomped Mr. Cutley, causing his death. "The proof of the severe and intensive nature of the beating, [the death that resulted], together with the statements of [the eyewitnesses] made a jury issue relative to whether [Williams] intended to kill [Mr. Cutley]." *Pulliam v. State,* 298 So.2d 711, 713 (Miss. 1974). This assignment of error is, too, without merit.

¶15. Unfortunately, *Pulliam,* has no application to the case at bar. That case involved an aggravated assault conviction which was reversed and remanded on the issue of whether "fists and feet" as referenced in the questioned jury instruction, constituted deadly weapons. The Court held that the instruction in that case had improperly defined them as deadly weapons.

¶16. The Petition for Writ of Certiorari argues the decision of the Court of Appeals is in conflict with *Dedeaux v. State,* 630 So.2d 30 (Miss. 1993) wherein Justice Smith writing for the majority opined that

> *. . . where it appears from the record in its entirety that there has been a miscarriage of justice, this Court applies Mississippi Supreme Court Rule 28(a)(3) to prevent manifest injustice.* *Cummins v. State,* 515 So.2d at 876, 877 also addressed whether the trial court was in error for refusing to instruct the jury:

> The State's instructions were offered without any objection ... In the absence of an objection at trial, this Court will examine only to prevent manifest injustice.... *Gates v. State*, 484 So.2d 1002 (Miss. 1986); *Shelton v. State,* 445 So.2d 844 (Miss. 1984).

> In light of the evidence reflected in the record, the murder conviction in the case sub judice appears to rise to the level of manifest injustice.

> The jury heard all the testimony and obviously rejected Dedeaux's self-defense argument. Although strategically the manslaughter instruction was rejected by Dedeaux, this decision does not detract from the jury's finding and from the testimony at trial that Dedeaux unlawfully took the life of Luke. To discharge the defendant cannot be justified.

In *Wells v. State*, 305 So.2d 333, 339-340 (Miss. 1974), the Court held:

In the case at bar, when the jury found the defendant guilty of murder, it necessarily found that defendant was guilty of homicide which was not justifiable or excusable, thus rejecting the defense of self defense and accident. If the case is remanded for a new trial on the indictment, the defendant would thereby be permitted to present to a second jury his defenses which were rejected by the first jury. We see no sound reason to remand for a new trial and thereby require the defendant to again be convicted of manslaughter before being punished.

In *Clemons v. State*, 473 So.2d 943 (Miss. 1985), this Court held that the facts would not support a conviction of murder but the evidence did establish guilt of manslaughter. The case was remanded for resentencing for the crime of manslaughter. Accord *Bradley v. State*, 413 So.2d 725 (Miss. 1982).

*Id.* at 33 (emphasis added).

¶17. In this case, there was some disagreement in the testimony as to why Mr. Cutley was initially attacked. However it was apparent from ***all*** the testimony that co-defendant Kevin Smith is the one who began or initiated the assault with a punch which threw Mr. Cutley to the ground. It is also clear that once the assault was begun by Kevin, the other participants, including Williams, spontaneously thereafter joined in what appears to be primarily a random act of mob violence. In *Blanks v. State,* 542 So.2d 222, 225 (Miss. 1989) the Court stated that

Premeditation is an element of murder. Miss. Code Ann. § 97-3-19(1) (Supp.1988). This connotes a prior design to kill. Although our law has never prescribed any particular ex ante time requirement, the essence of the required intent is that the accused must have had some appreciable time for reflection and consideration before pulling the trigger. In this context, we have for years condemned instructions that tell the jury in homicide cases that "malice aforethought" or "deliberate design" may be found though it has existed in the mind of the accused but for an "instant" or a "moment". The most recent of these cases is *Windham v. State*, 520 So.2d 123 (Miss. 1988) where we said

It is a contradiction in terms to state that a "deliberate design" can be formed at the very moment of the fatal act.

*Windham,* 520 So.2d at 126. See also *Watts v. State,* 305 So.2d 348, 350 (Miss. 1974) ("but for an instant at the very time the shot is fired"); *Toney v. State,* 298 So.2d 716, 719-20 (Miss. 1974) (same); *Pittman v. State*, 297 So.2d 888, 893 (Miss. 1974) (same); *Patterson v. State,* 289 So.2d 685, 686 (Miss. 1974) ("at the very moment the fatal shot was fired"); *McDonald v. State,* 78 Miss. 369, 375, 29 So. 171, 172 (1901) ("existed but an instant"). Cf. *Nicolaou v. State,* 534 So.2d 168, 173 (Miss. 1988). Where such instructions are given in a case where under the evidence the jury might reasonably have concluded that the defendant acted in the heat of passion, we will on the authority of these cases ordinarily reverse.

*Id.* at 226-27. (footnotes omitted). In reviewing this record in the best possible light to the prosecution's case, there is little in the testimony of the three eye-witnesses/co-defendants that goes to proof of deliberation or aforethought of Williams to kill Cutley prior to his joining the affray. Also, the State failed to establish any kind of timeline of the event. For instance, there is nothing in this record indicating the length of time between Kevin Smith's throwing the initial blow, and when and at what intervals the others joined in

and/or participated or even how long the entire incident lasted.

¶18. In *Catchings,* in which both the manslaughter and deliberate design instructions were given, the majority held that giving of the deliberate design instruction was harmless error inasmuch as the manslaughter instruction was not warranted apparently based on the fact that Catchings raised an issue of self-defense at trial. This distinguishes this case from *Catchings,* as Williams did not assert self-defense at trial. As the Court said in *Windham v. State,* 520 So.2d 123, 126 (Miss. 1987), "it is a contradiction in terms to state that a 'deliberate design' can be formed at the very moment of the fatal act. Moreover, it is possible for a deliberate design to exist and the slaying nevertheless be no greater than manslaughter."

¶19. Because there is a substantial question and therefore an issue as to whether there was sufficient proof by which the jury could have reasonably concluded that William's premeditated design to kill, if any, existed in his mind before joining the affray, and because the jury was given no guidance as to whether Williams had sufficient opportunity to harbor malice or design to kill, as was proffered in D-10, it was as previously stated, in this case, error to refuse such an instruction.

### III.

¶20. Williams also asserts that the trial court erred in failing to grant accomplice instructions regarding the testimony of the three co-defendants. The Petition for Writ of Certiorari cites conflict with *Wheeler v. State,* 560 So.2d 171 (Miss. 1990). In *Wheeler,* the Court did reverse on this basis, however, in that case, the conviction was based on the testimony of one co-conspirator and the decision was based in part on the peculiar facts circumstances of that case. *Id.* at 174. In this case, the Court of Appeals opined that

> In Williams's fifth assignment of error, he argues that proposed jury instruction D-14, an "accomplice cautionary instruction," should have been submitted to the jury. We disagree. The supreme court has held on numerous occasions that "the trial court has broad discretion in deciding whether to grant a cautionary instruction regarding the testimony of an accomplice; and the refusal to give such an instruction does not constitute reversal error." *Green v. State,* 456 So.2d 757, 758 (Miss. 1984). "However, that discretion is subject to abuse when the State's evidence rests solely upon the testimony of an accomplice and there is some question as to the reasonableness and consistency of the testimony, or the defendant's guilt is not clearly proven . . ." *Id.* After review of the record, we find that the State's evidence was not wholly dependent on the testimony of Jeffery. Arnotia and Katrina's testimony as well as the testimony of the Jackson police officers corroborated the fact that Williams participated in a beating which caused the death of Mr. Cutley. We find no merit in this argument.

¶21. In reviewing the record, the three co-defendants did testify that Williams participated in the beating. While the "corroboration" offered by the police officers is weak at best,[4] in this case, the testimony of the three witnesses was only somewhat consistent and corroborated each other to the extent that Williams did in fact kick Cutley as he lay on the ground. We note, however, that this Court has reversed and remanded cases for failure to give accomplice instructions when the co-conspirators had given prior inconsistent statements. *See Ferrill v. State*, 643 So. 2d 501 (Miss. 1994) and *McGee v. State*, 608 So. 2d 1129 (Miss. 1992)

¶22. For clarity on this point, the testimony of the three non-law enforcement witnesses for the State will be summarized and discussed.

**Arnotia Baker:**

¶23. Arnotia was Kevin Smith's girlfriend at the time of this incident, and she stated that Kevin was looking for someone to fight "because this other boy was trying to talk to me that night, and he [Kevin] was asking me why I didn't bring them  let him follow me over to Kevin's house that night so he can fight him, and he [Kevin] was trying to find somebody to jump on that night."

¶24. Arnotia testified that she first noticed Mr. Cutley after someone she thought was her father passed her, Kevin and Catrina Smith in a vehicle, and she waved. Cutley, who was across the street apparently thought she was waving at him and waved and said something back to her. This is when Kevin Smith approached Cutley, striking him and knocking him to the ground. The other parties then joined the affray at varying intervals thereafter.

¶25. Arnotia stated that Williams joined the affray with "Robert and John" (referring to Robert Hicks and John Thomas) and was "kicking him in his sides." She also stated that the first time she had seen or met Williams was the night of this incident.

¶26. On cross examination, Arnotia, who had already admitted to lying to police on direct, further admitted that she even lied about her own identity, telling investigating officers her name was Lakesha. The following was also elicited from Arnotia on cross.

> Q. Now, in the statement that you gave the police, you also said  you told the police, and you signed your name on it here, you said that the man called you a bitch, didn't you?
>
> A. Yes.
>
> Q. That's a lie, isn't it?
>
> A. Yes.
>
> * * *
>
> Q. Did you tell the police that he (referring to Cutley) had taken some dope from Kevin?
>
> A. No
>
> Q. I'll read from your statement. Did you say this? "I think they didn't like that ole guy because he had snatched some of their dope one time." Did you put  did you sign that statement? I'll show it to you
>
> A. I guess I had to
>
> Q. I'll let you look at it. Is that what you put in the statement?
>
> A. Yes.
>
> Q. How much do you know about this man using dope?
>
> * * *

A. I don't know anything about him. When I told the police that stuff that I told them is because at first I was trying to help Kevin and them. That's why I lied at first.

Q. And you're still trying to help Kevin, aren't you

A. No. No. I don't have any contact I don't talk to Kevin, and his sister, or nobody else.

Q. You've told so many lies about this case, you don't know what the truth is, do you?

A. Yes, I know. The part I can remember.

Q. All right. Your memory's bad about that night?

A. My memory's bad period.

¶27. Although Arnotia , whom the record reflects was the catalyst generating the ensuing assault, apparently did not participate directly in the beating, and for whatever reason was not prosecuted, she did admit to conspiring with Kevin and some of the others who were ultimately charged in concocting a lie to police in order to obstruct the investigation of the incident, and did in fact, by her own admission, give a false written statement. In any event, she was more than a mere eyewitness.

**Catrina Smith**:

¶28. Catrina was twelve years of age at the time of the incident, and was "prosecuted" as a juvenile in relation to this incident. She is Kevin Smith's younger sister. The following is a verbatim excerpt of her testimony from this record on direct examination.

And they came back from the store, and it was a man walking down the screet, and I guess they turnt (sic) around he turnt around and said something, and my brother said, "What you say?" And then he walked my brother walked up to him, and the man swung at my brother, and my brother ducked and swung back at him. He ran in the house and put on some shoes, and he came back outside. The rest of the boys were already jumping on the man, and Arnotia were holding my brother, and the boys were jumping on the man. Then I went over there to roll his head over to see were he dead, and John pushed me, and he kept on stomping the man.

The only physical contact with Cutley to which Catrina would admit was using her foot to roll his head over to "see if he were dead." She is the only witness to testify that Cutley threw the first punch. Arnotia later testified that Catrina was kicking Cutley. Further, Jeffrey Myers would testify that Kevin Smith continued to hit Cutley.

**Jeffrey Myers:**

¶29. Myers, who was 18 years old at the time of the incident, pled guilty to manslaughter. He testified that he participated in the beating and that he kicked Cutley six or seven times in the legs. He also testified that Kevin Smith was crouched over Cutley hitting him with his fists in the back of the head and that John Thomas was the only individual who kicked Cutley in the head. He also stated that he was kicking Cutley in the right leg and this Defendant, Don Williams, was kicking him in the right leg also about six or seven times.

¶30. The discrepancies in the testimony of these three witnesses are glaringly obvious and cause serious

concern as to their veracity.

¶31. In *Burke v. State,* 576 So.2d 1239 (Miss. 1991) the Court said

> This Court has embraced a principle that the granting of a cautionary instruction regarding the testimony of an accomplice witness is discretionary with the trial court. *Wheeler v. State,* 560 So.2d 171, 172 (Miss. 1990); *Derden v. State*, 522 So.2d 752, 754 (Miss. 1988); *Van Buren v. State,* 498 So.2d 1224, 1229 (Miss. 1986) and *Holmes v. State*, 481 So.2d 319, 322 (Miss. 1985). That discretion is not absolute, however; it may be abused.

> Where the state's evidence rests solely upon the testimony of an accomplice witness, this Court has said that the trial court errs in failing to give a cautionary instruction. *See Holmes v. State*, 481 So.2d 319, 322- 23; *Hussey v. State*, 473 So.2d 478, 480 (Miss. 1985). Additionally, the Court has found abuse of discretion where there is some question as to the reasonableness and consistency of the testimony of the accomplice or the defendant's guilt is not clearly proven. *Green v. State*, 456 So.2d 757, 758 (Miss. 1984).

> In Holmes, this Court delineated a two-part test to determine whether a trial judge abused his discretion. First, was the witness in fact an accomplice, and secondly, was his testimony without corroboration. *Holmes v. State*, 481 So.2d at 323.

> **An accomplice for these purposes is a person who is implicated in the commission of the crime. That is to say, that if the evidence admits a reasonable inference that the witness may have been a co-perpetrator or the sole perpetrator the cautionary instruction should be given.** *Dedeaux v. State*, 125 Miss. 326, 87 So. 664 (1921). Here, Stallworth admitted or, more accurately, alleged that she was approached to be a look-out. She wound up with the stolen property. We have only her word for whether she bought the property from Burke. Quite possibly she helped steal it, planned the stealing or, even, stole it. These inferences, arising as they do from the evidence, dictate that the proffered instruction be given.

*Id.* at 1242. (emphasis added).

¶32. Arnotia was much more than a passive observer. It is not necessary for an accomplice to be prosecuted, and Arnotia may be considered to be an accomplice even though she was not prosecuted for her participation or later attempts to obstruct the investigation. Furthermore, since there was no corroboration of the testimony of these three witnesses, other than each other, the instruction would be mandatory. *See Holmes v. State*, 481 So.2d 319, 322- 23 (Miss. 1985); *Hussey v. State*, 473 So.2d 478, 480 (Miss. 1985); *Edwards v. State,* 630 So.2d 343, 343-44 (Miss. 1994).

¶33. More importantly, especially as to Arnotia's testimony, in *Ferrill v. State,* 643 So.2d 501 (Miss. 1994), this Court reversed and remanded the conviction for the trial court's failure to grant a cautionary instruction based on prior inconsistent statements of the State's witness.

¶34. In this case, all of the witness testifying had lied at some point to police officers about their own involvement in the matter. As there was error in denying the cautionary instruction in this case, the cumulative effect of this error combined with the failure to properly instruct the jury on the question of deliberation or premeditation in a case with questionable proof thereon merits reversal.

## IV.

¶35. For the foregoing reasons the judgment of the Court of Appeals and that of the circuit court are reversed and this matter is remanded to the circuit court for further proceedings.

¶36. **REVERSED AND REMANDED.**

**PRATHER, C.J., SULLIVAN, P.J., McRAE AND WALLER, JJ., CONCUR. SMITH, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY PITTMAN, P.J., ROBERTS AND MILLS, JJ.**

**SMITH, JUSTICE, DISSENTING**:

¶37. The majority reverses the Court of Appeals affirmance of guilt of murder by Williams of Jessie Cutley as Cutley merely walked home alone on a public street in Jackson. The majority holds that the trial court erred in that there was no instruction adequately explaining the required elements of deliberation or premeditation to guide the jury in differentiating between murder and manslaughter. The majority also faults the trial court for failure to give a cautionary instruction regarding accomplice testimony. I disagree and am compelled to dissent.

¶38. This Court has stated that it is unnecessary and unwise to define malice in a jury instruction. *Nicolaou v. State*, 534 So. 2d 168, 174 (Miss. 1988). It is not error to refuse an instruction defining "malice and deliberate design." *Catchings v. State*, 684 So. 2d 591, 599 (Miss. 1996) (*citing Collins v. State*, 534 So. 2d 29, 35 (Miss. 1992)). Though the precise definition of deliberate design was not given, our Court will not reverse when the jury has been properly instructed by the granting of other instructions. *Catchings*, 684 So. 2d at 599. Regardless, there is nothing confusing or in conflict about instructions S-1 and S-4. Instruction S-1 defined murder as "the killing of a human being, not in necessary self-defense, and without authority of law, by any means or any manner, when done with the deliberate design to effect the death of the person killed." Murder requires that the homicide have been committed with malice aforethought and after deliberation. *Hammock v. State,* 379 So. 2d 323, 328 (Miss. 1980). This Court has consistently held that malice aforethought, premeditated design, and deliberate design all mean the same thing. *Johnson v. State*, 475 So.2d 1136, 1139 (Miss. 1985); *Fairman v. State*, 513 So. 2d 910, 913 (Miss. 1987). Deliberate design is synonymous with malice aforethought and synonymous phrases may be used in properly instructing the jury. *Lancaster v. State*, 472 So. 2d 363, 367 (Miss. 1985). The *Johnson* Court also held that synonymous phrases or interchangeable words may be used in a jury instruction and the jury still be properly instructed. *Id.* at 1140.

¶39. Instruction S-4, in defining manslaughter, instructed the jury that it was "the killing of a human being in the heat of passion, without malice, in a cruel or unusual manner, without authority of law, and not in necessary self-defense." The words deliberate design and malice are synonymous, thus Instruction S-1 was proper. Considering both instructions, the jury was properly instructed as to the two separate crimes. Failure to give a particular instruction is reversible only if the instruction was substantially correct, the refused instruction was not substantially covered by other instructions given, and concerned an important point at trial so that failure to give the instruction seriously impaired upon the defendants' ability to present a given defense. *United States v. Andrews*, 22 F. 3d 1328, 1345 (5th Cir. 1994).

¶40. Both Instructions, S-1 and S-4, tracked the language of Mississippi Code Ann. § 97-3-19 and § 97-3-35. Jurors were instructed not to single out one instruction as stating the law but rather they should read all instructions and consider them together in arriving at their verdict. Considering these instructions as a whole, there is nothing conflicting nor confusing.

¶41. The majority's reliance upon *Edwards*, *Holmes and Hussey* is misplaced. In *Edwards v. State*, 630 So.2d 343 (Miss. 1994), Edwards was found guilty of the sale of cocaine. An agent gave Teresa Stevenson twenty dollars with which Stevenson and a confidential informant, Donna Taylor, purchased crack cocaine from Edwards. Stevenson was subsequently indicted, along with Edwards. Stevenson plea bargained for four years and her testimony against Edwards. Edwards argued that under the authority of *Derden v. State*, 522 So. 2d 752, 754 (Miss. 1988), two factors must be considered in the granting of a cautionary instruction: (1) was the witness in fact an accomplice, and (2) was his testimony without corroboration. Edwards asserted that a cautionary instruction regarding an accomplice's credibility should not be dependent solely upon the corroboration of a confidential informant. The thrust of the argument of Edwards was based upon *Williams v. State*, 463 So. 2d 1064 (Miss. 1985), and the potential for miscarriage of justice where the prosecution develops its cases through the testimony of a confidential informant compensated on a contingency fee basis.

¶42. In *Williams*, the Court held that if the full facts and circumstances of the State's pay arrangement with the informant were disclosed to the jury, and there was adequate opportunity to cross-examine the informant, a subsequent conviction would not be disturbed.

¶43. In *Edwards*, the full facts and circumstances of the pay arrangement with the confidential informant were not revealed to the jury. The Court held that without Taylor, the informant, the State was left with nothing but the testimony of Stevenson, an accomplice. The granting of the cautionary instruction was mandatory and failure to do so was an abuse of discretion.

¶44. In *Holmes v. State*, 481 So. 2d 319 (Miss. 1985), except for the testimony of the accomplice, the evidence against Harvey Holmes was nonexistent. This Court held that when faced with such a situation, the trial judge must accede to the accused's request and grant a cautionary instruction.

¶45. In *Hussey v. State*, 473 So. 2d 478 (Miss. 1985), the prosecution was based entirely on the testimony of the accomplice.

¶46. More recently, in *Brewer v. State*, No. 95-DP-00915-SCT (Miss. July 23, 1998), in determining whether a defendant was entitled to a cautionary instruction on accomplice testimony, this Court stated that an accomplice is a person who is implicated in the commission of a crime. Here, Arnotia Baker was not implicated in the commission of the crime. She was not charged or indicted, thus she cannot be considered an accomplice. Therefore, no cautionary instruction is warranted.

¶47. In considering the issue of accomplice testimony, the general rule is that "Where the State's evidence rests solely upon the testimony of an accomplice witness, this Court has held that the trial court errs in failing to give a cautionary instruction." *Brown v. State*, 682 So. 2d 340, 345 (Miss. 1996)( *citing Holmes v. State*, 481 So. 2d 319, 322-23 (Miss. 1985); *Hussey v. State*, 473 So. 2d 478, 480 (Miss. 1985)). In the case *sub judice*, the State's evidence did not rest solely upon accomplice testimony.

¶48. In considering the majority's view that the trial court erred in failing to give an accomplice instruction to

the jury, there exists one major fact in the case *sub judice* which supports the trial judge's discretion in refusing that instruction: Arnotia Baker was not implicated in the incident and was not an accomplice, but rather was an eyewitness to Cutley's death. Baker testified that she observed Williams and others, who were accomplices, kicking and hitting Cutley. Baker's testimony corroborated the testimony of others who in fact were accomplices. Catrina Smith and Jeffrey Myers' testimony was consistent with Baker's testimony. Their testimony was also reasonable. There was more than sufficient testimony that Williams joined in the kicking and beating of Cutley as he lay helpless on the ground after being knocked down by a single blow from one of the other accomplices. Baker's testimony removes the case from those requiring a cautionary accomplice instruction. *See **Ferrill v. State***, 643 So. 2d 501, 506-07 (Miss. 1994). Additionally, the testimony of Jackson police officers also offered corroborating evidence sufficient to show that Williams participated in the kicking and beating of Cutley as he lay helpless on the ground. This uncalled for and unnecessary mob violence upon Cutley caused subdural hematomas and congestive heart failure, which according to the coroner's report and Dr. Galvez, caused Cutley to choke on his own blood and ultimately caused his death. Cutley was not killed by accident, or misfortune and not by one acting in self-defense, but rather his cruel and unusual death was caused by Williams and others who willingly participated in effectuating Cutley's death.

¶49. In the case *sub judice*, two accomplices did testify as well as Baker, an eye-witness who was not implicated, indicted as a co-defendant, nor can she be claimed to be an accomplice.

¶50. I would affirm the unanimous Court of Appeals decision authored by the learned Judge King who found no error by the trial court.

¶51. I respectfully dissent.

**PITTMAN, P.J., ROBERTS AND MILLS, JJ., JOIN THIS OPINION.**

1. There was conflicting testimony as to Williams' participation. All of the witnesses testified that Williams joined in the affray by kicking the victim after he was on the ground, but only one, Catrina Smith, testified that he rendered a kick to Cutley's head. Smith admitted lying to police and other parts of her testimony are suspect as will be pointed out later.

2. The state did not object to D-10 nor is there any reason for its denial given by the trial court in the record.

3. Although portions of *Catchings* are applicable to the case at bar, this case is factually distinguishable from *Catchings*, and the question of whether an instruction clearly defining "deliberate design" was not reached in that case as the Court held that the granting of that particular deliberate design instruction in that case which allowed the jury to consider "instantaneous design" was harmless error as manslaughter was not supported by the facts of that case. Also, the *Lancaster* case cited by the Court of Appeals did not involve a murder/manslaughter question as no manslaughter instruction was granted in that case.

4. The officers did not arrive at the scene until well after the beating. Their testimony involved their observations at the scene and the statements given at the time, which were inconsistent as pointed out

hereafter.