# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-KA-01622-COA

**STANLEY PACE A/K/A STANLEY JOE PACE**        **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**        **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 10/10/2018 |
| TRIAL JUDGE: | HON. PAUL S. FUNDERBURK |
| COURT FROM WHICH APPEALED: | MONROE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: MOLLIE MARIE McMILLIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BILLY L. GORE |
| DISTRICT ATTORNEY: | JOHN WEDDLE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/04/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE J. WILSON, P.J., TINDELL AND C. WILSON, JJ.**

**C. WILSON, J., FOR THE COURT:**

¶1. After a trial held October 8–10, 2018, a Monroe County jury convicted Stanley Pace of first-degree murder. The circuit court sentenced Pace to serve life imprisonment in the custody of the Mississippi Department of Corrections (MDOC). Pace filed a post-trial motion for judgment notwithstanding the verdict or, alternatively, a new trial, which was denied by operation of Rule 25.3 of the Mississippi Rules of Criminal Procedure.[1] Pace now

---

[1] Mississippi Rule of Criminal Procedure 25.3 provides that "[a] motion for a new trial or a motion to vacate judgment pending thirty (30) days after entry of judgment shall be deemed denied as of the thirtieth (30th) day after the motion was filed."

appeals his conviction, raising only one ground for reversal, namely, that he received ineffective assistance of counsel. Finding no merit in Pace's contention, we affirm.

FACTS AND PROCEDURAL HISTORY

¶2. On January 15, 2016, Harold Williams spent the day with his friend Ronnie Duke. That afternoon, the pair picked up Pace (Williams's cousin) so Pace could work on the brakes of Williams's truck. The trio decided to take a quick road trip to Pace's home in Birmingham, Alabama, so Pace could get the necessary tools and check on his house before returning to Williams's trailer that evening.

¶3. After returning from Alabama, the trio spent the evening drinking excessively and playing video games, rather than repairing Williams's truck brakes. During the course of the evening, while Williams and Pace were playing a video game, Pace and Duke got into a fight. (According to Pace and Williams, Duke was angry because they excluded him from playing the video game.) Duke approached Pace from behind, grabbed Pace in a chokehold, and pulled Pace off his chair. The fight continued outside Williams's trailer with Pace "busting" Duke's lip. Thereafter, Pace and Duke re-entered the home and appeared to make amends. At some point later, Duke pulled out a small pocketknife, which prompted Williams to remove his replica Civil War sword off the wall and say, "[T]hat's not a knife . . . *this* is a knife." Pace testified that after Duke pulled his pocketknife out, he told Duke that he was "scared of a knife" and "whatever you do, please do not pull another knife on me because I am [deathly] scared of it." After this exchange, the trio resumed drinking, playing video

2

games, and watching movies.

¶4.    Later in the night, Pace and Duke fought again. Heavily intoxicated, Pace ran outside to vomit off the porch. Duke followed Pace and pushed Pace off the porch. Williams ran outside and found Pace face down in the grass. Duke announced that he was leaving and began walking down the road. Pace stood up, re-entered Williams's trailer, grabbed Williams's Civil War sword, and proceeded to tell Williams, "I am going to kill [Duke]." Pace took off after Duke, armed with the sword. Williams went back inside. Williams testified that Pace returned to the trailer in the early hours of January 16, 2016, and told Williams, "I killed your friend."

¶5.    On January 17, 2016, Williams called the Monroe County Sheriff's Office to report that Pace had killed Duke. Williams told deputies that Pace had used Williams's truck to move Duke's body. Officers found blood spots inside and outside Williams's truck and found a pool of blood in the grass about 250 to 300 feet away from Williams's trailer. Officers also noticed drag marks from the pool of blood to a wooded area across the street. While the officers found more blood on the leaves in the woods, they did not find Duke's body or the murder weapon there. The deputies eventually found a large blade under Williams's trailer; however, the handle was missing. The officers returned to the crime scene and found a handle near the pool of blood, but the officers could not match the handle and the blade because the blade was missing the tang to hold the handle in place. Duke's body was also still missing.

3

¶6.    Pace was arrested on January 17, 2016.  Pace was read his *Miranda* rights[2] and then was interviewed at the sheriff's office.  At first, Pace denied any knowledge of what happened to Duke.  But during the interview, Pace eventually admitted that he and Duke were involved in a fight and that he "busted [Duke's] lip."  According to Pace, Duke walked away after their second fight and then came back inside the trailer and sat down in the living room.  Duke then announced that he was leaving and left the trailer.  Pace stated that he did not know if someone came to pick up Duke or if Duke walked away.

¶7.    Personnel with the Monroe County Sheriff's Office interviewed Pace again the following day.  This time, Pace admitted to taking Williams's sword and following Duke when Duke left the trailer after their second fight.  Pace also described the deadly altercation between Duke and himself that occurred on the side of the road.  Pace stated that Duke brandished the pocketknife he had displayed earlier and that Pace tried to knock it out of his hand with the sword.  Pace told the investigator that there was a struggle, and he admitted to stabbing Duke "three or four times" with the pocketknife.  Pace told the investigator that Duke's "last words [were] 'I am going to kill you[,]' [and] I said, 'No you are not,' and I think I cut his throat."  Pace stated that he then went back to the trailer, took Williams's truck, loaded Duke's body, and dumped Duke's body in a gully a few miles from the crime scene. After the conclusion of the second interview, Pace willingly accompanied the officers

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).  The record reflects that Pace waived his *Miranda* rights prior to the interrogation.

4

to the location of Duke's discarded body.

¶8.    A Monroe County grand jury indicted Pace for first-degree murder on November 23, 2016.  Pace's three-day trial began on October 8, 2018.  At trial, Dr. John Brentley Davis, who was qualified as an expert in the field of forensic pathology, testified that Duke "had been stabbed at least nineteen times in the chest" and suffered "a broken arm[,] . . . fractures to his skull[,] . . . bleeding around his brain, [and] injuries from the stab wounds to his left lung, heart and diaphragm . . . ."  Dr. Davis described stab wounds and chop wounds, as well as defensive wounds to Duke's palm and right hand and arm.  Dr. Davis opined that based on the severity of the wounds, the depth of the stab wounds, the skull fractures, and Duke's broken arm, these wounds were caused by a larger blade than a small pocketknife.  Dr. Davis concluded that "[t]he cause of [Duke's] death [was] sharp and blunt force injuries."

¶9.    Williams testified to the events of that night and confirmed that when Pace came back in the trailer, Pace told him, "Harold, I killed your friend."  Williams stated that he thought Pace was joking and questioned Pace's sincerity, to which Pace responded, "No, I'm serious. I killed him."

¶10.    Pace testified in his own defense.  Pace said that he killed Duke in self-defense, stating that during their roadside fight, Duke told him, "I am [going] to kill you," while he was holding Pace in a chokehold with the pocketknife in his hand.  Pace testified that he could feel Duke's pocketknife against his wrist.  Pace also testified that he had "lost" the sword during the fight but that he was able to pry Duke's pocketknife out of his hand.  Pace

5

admitted to stabbing Duke "two or three times" with the pocketknife. Pace said that after the stabbing, he "felt [Duke's] spirit come out of his body." Pace confirmed that the sword's blade and handle somehow broke during this incident. Pace never denied killing Duke. In fact, Pace largely corroborated Williams's testimony, testifying that after the killing, he returned to Williams's trailer covered in blood and told Williams that he had killed Duke.

¶11. The circuit court gave Pace's self-defense jury instructions, which instructed the jury (1) to find Pace not guilty if Pace "had reasonable cause to believe . . . that he was in imminent danger of being killed or receiving serious bodily harm at the hands of [Duke], and that it was necessary for [Pace] to stab [Duke] to save his own life"; (2) that "all that is necessary . . . to establish self-defense is that at the time of the killing, the [d]efendant had reasonable grounds to apprehend danger of his life or good reason to believe that his life was in danger on account of the actions of the deceased"; and (3) that Pace was "not required to retreat or to consider whether he could safely retreat" and could stand his ground and use reasonable force "[i]f he honestly and reasonably [was] in fear of death or serious bodily harm." The circuit court also gave the State's jury instructions on the lesser-included offenses of second-degree murder, heat-of-passion manslaughter, and culpable-negligence manslaughter.[3] The jury found Pace guilty of first-degree murder, and the circuit court sentenced Pace to serve life imprisonment in the custody of the MDOC.

¶12. On October 19, 2018, Pace filed a motion for judgment notwithstanding the verdict

---

[3] Pace's trial counsel did not object to any of these instructions.

or, alternatively, a new trial, which was denied by operation of Mississippi Rule of Criminal Procedure 25.3. Pace appeals, contending that he received ineffective assistance from his trial counsel due to counsel's failure to request another jury instruction for "imperfect" self-defense. We find no merit in Pace's assignment of error and therefore affirm.

DISCUSSION

¶13. Pace contends that his trial counsel was ineffective because counsel failed to request a jury instruction on imperfect self-defense manslaughter. "This Court rarely reviews ineffective-assistance-of-counsel claims on direct review." *Boudreaux v. State*, 189 So. 3d 1274, 1280 (¶19) (Miss. Ct. App. 2016) (citing *Aguilar v. State*, 847 So. 2d 871, 878 (¶17) (Miss. Ct. App. 2002)). "However, we 'will rule on the merits on the rare occasions where (1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge.'" *Id*. (quoting *Aguilar*, 847 So. 2d at 878 (¶17)). "Review on direct appeal . . . is confined strictly to the record." *Id.* at (¶20) (citing *Colenburg v. State*, 735 So. 2d 1099, 1101 (¶5) (Miss. Ct. App. 1999)). Here, Pace raises ineffective assistance as his only issue, and the parties stipulate that the record is adequate for appellate review. We therefore reach the merits of Pace's claim.

¶14. To prove ineffective assistance of counsel, Pace must show that (1) "his counsel's performance was deficient," and (2) this deficiency "prejudiced his defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To overcome the strong presumption that counsel's

7

performance falls within the range of reasonable professional assistance, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Boudreaux*, 189 So. 3d at 1280 (¶21) (citing *Strickland*, 466 U.S. at 694). Further, "[f]or an ineffective-assistance claim, the context of counsel's actions are carefully reviewed, and 'where reasonable under the circumstances, we presume the decisions were sound trial strategy.'" *Cooley v. State*, 271 So. 3d. 765, 773 (¶26) (Miss. Ct. App. 2018) (other internal quotation marks omitted) (quoting *Sea v. State*, 49 So. 3d 614, 617 (¶12) (Miss. 2010)).

¶15.    At trial, the record indicates that Pace's trial counsel requested—and the court gave—a jury instruction on "perfect" self-defense.[4] Pace's instruction instructed the jury to find Pace not guilty if they found that he "reasonably believed that [Duke] was attempting to stab [him] . . . and that [Pace] had reasonable cause to believe . . . that he was in imminent danger of being killed or receiving serious bodily harm . . . and that it was necessary for [Pace] to stab [Duke] to save his own life."   On appeal, Pace contends that he received ineffective assistance of counsel due to his trial counsel's failure to request an additional instruction on imperfect self-defense manslaughter.  Pace argues that such an instruction was warranted because the "facts of the case turn on the reasonableness of Pace's actions," and the evidence at trial supported such an instruction.  Pace asserts that the jury should have

---

[4] In his briefing on appeal, Pace does not acknowledge that a self-defense instruction was requested by his counsel and given by the court.  Pace only acknowledges the manslaughter instructions requested by the State.

been instructed to consider whether Pace killed Duke while under a bona fide, though unreasonable, belief that he had to kill Duke to protect himself.

¶16.    "When reviewing jury instructions, [this Court] read[s] the instructions 'as a whole to determine whether the jury was fully and fairly instructed according to the applicable law.'" *Jackson v. State*, 68 So. 3d 709, 712-13 (¶12) (Miss. Ct. App. 2011) (quoting *Clark v. State*, 40 So. 3d 531, 544 (¶36) (Miss. 2010)).  "A defendant is entitled to have jury instructions given which present his theory of the case, however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law . . . or is without foundation in the evidence."  *Howell v. State*, 860 So. 2d 704, 745 (¶142) (Miss. 2003) (quoting *Humphrey v. State*, 759 So. 2d 368, 380 (¶33) (Miss. 2000), *abrogated on other grounds by Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 39 (¶¶22-23) (Miss. 2003)).  Nevertheless, "if all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law, no error results."  *David v. State*, 130 So. 3d 1141, 1146 (¶13) (Miss. Ct. App. 2013) (quoting *Clark*, 40 So. 3d at 544 (¶36)).

¶17.    Pace asserts that the following evidentiary foundation supported an imperfect self-defense jury instruction: (1) Pace's testimony that he killed Duke during the roadside struggle; (2) his testimony that Duke told him that he would kill Pace; (3) his testimony that Duke pulled a pocketknife on Pace before the roadside struggle; (4) Williams's testimony that Duke was the initial aggressor during the fights that took place at Williams's home; and (5) Williams's testimony that Duke pulled the pocketknife on Pace after the initial fight.

Given this evidence, Pace contends that his trial counsel was deficient in failing to request such an instruction, giving rise to "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Boudreaux*, 189 So. 3d at 1280 (¶21) (quoting *Strickland*, 466 U.S. at 694). We disagree.

¶18. First, Pace fails to show that his trial counsel's performance was deficient. "We are reminded here that 'there is no single, particular way to defend a client or to provide effective assistance.'" *Cooley*, 271 So. 3d at 773 (¶29) (quoting *Reynolds v. State*, 736 So. 2d 500, 511 (¶41) (Miss. Ct. App. 1999)). The record reflects that Pace's trial counsel requested three instructions pertaining to self-defense and that the State requested jury instructions on second-degree murder, heat-of-passion manslaughter, and culpable-negligence manslaughter. Trial counsel's failure to request an additional imperfect self-defense instruction may well have been driven by trial strategy, which, based on the record, was centered around theories of self-defense and heat-of-passion manslaughter. While Pace has the right to present his theory of the case, that "right is not absolute," *Jackson*, 68 So. 3d at 713 (¶12), and here, Pace fails to overcome the strong presumption that his counsel's performance fell within the wide range of reasonable professional assistance.

¶19. Regardless, we also find the second prong of *Strickland* is not met. In other words, even if trial counsel was deficient for failing to offer an imperfect self-defense manslaughter instruction, Pace fails to show how this omission prejudiced his case. In *Cooley v. State*, this Court found no ineffective assistance of counsel for counsel's failure to offer a defense-of-

others instruction. *Cooley*, 271 So. 3d. at 773 (¶29). This Court concluded that Cooley "fail[ed] to show that there was a reasonable probability the instruction would have changed the outcome of the trial." *Id*. This was because "[Cooley] [did] not overcome the strong presumption that, under the circumstances, his defense counsel not offering this instruction was part of his trial strategy." *Id*. This Court noted that "[o]ffering such an instruction may have detracted from his theory of self-defense, which appeared to be his primary theory" and that "[a] defense-of-others theory was not strongly elicited during witness testimony by defense counsel, and it was only mentioned briefly during closing argument." *Id*.

¶20. Likewise, Pace "fails to show that there was a reasonable probability" that the imperfect self-defense manslaughter instruction "would have changed the outcome of the trial." *Id*. During his closing argument, Pace's trial counsel stated that Pace was "asking [the jury] to determine whether or not [they] [thought] he acted out of self-defense or in the heat of passion." Counsel also told the jury that after reviewing the evidence and instructions, "that if you don't believe this was entirely self-defense, in fact if you don't believe [that] there was any self-defense in this at all, you will see clearly that it is in fact a heat of passion case, and that it is manslaughter and not deliberate determined murder."

¶21. In addition to counsel's jury argument, as stated supra, Pace's trial counsel requested jury instructions pertaining to self-defense, and the State requested jury instructions on second-degree murder, heat-of-passion manslaughter, and culpable-negligence manslaughter. When taken as a whole, these instructions "fully and fairly" instructed the jury on the

11

applicable law. *Jackson*, 68 So. 3d at 713 (¶12). Not only was the jury adequately instructed on the charged offense (first-degree murder), the jury was also instructed on lesser-included crimes (second-degree murder, heat-of-passion manslaughter, and culpable-negligence manslaughter), as well as Pace's theory of self-defense. "It is easy [for Pace] to be a Monday morning quarterback" and retrospectively pick out and analyze "the defects and flaws" in trial counsel's "tactics and strateg[ies]" pertaining to jury instructions. *Berry v. State*, 345 So. 2d 613, 615 (Miss. 1977) (citing *Rogers v. State*, 307 So. 2d 551, 552 (Miss. 1976)). But Pace fails to establish a reasonable probability that had his attorney requested an imperfect self-defense instruction, the jury verdict would have been different.

¶22.    Pace had "no constitutional right to errorless counsel" but was entitled to "competent counsel." *Parker v. State*, 30 So. 3d 1222, 1233 (¶38) (Miss. 2010). On the record in this case, we cannot find that Pace's trial counsel was constitutionally deficient. Accordingly, Pace's assignment of error on appeal is without merit.

¶23.    **AFFIRMED.**

**BARNES, C.J., CARLTON AND J. WILSON, P.JJ., GREENLEE, TINDELL, McDONALD, LAWRENCE AND McCARTY, JJ., CONCUR. WESTBROOKS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**